## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LANCE A. ZEGLEN,** | : |
| **Plaintiff,** | : **CIVIL ACTION NO. 04-1940** |
| **v.** | : **(MUNLEY, D.J.)** |
| | **(MANNION, M.J.)** |
| **JEFFREY MILLER, CYNTHIA TRANSUE, JOHN DUBY, FARZAD SHARIF, BARRY TITLER, NICHOLAS SAITES, RICK BROWN, MICHAEL PATRICK, GARRETT RAIN, CHRISTOPHER CARUSONE, and BROOKE QUICK,** | : |
| **Defendants** | : |

## REPORT AND RECOMMENDATION

Pending before the court is a motion for summary judgment filed by defendants Miller, Transue, Duby, Sharif, Titler, Saites, Brown, Patrick, Rain, and Carusone.[1]  (Doc. No. 53).  Upon consideration, the defendants' motion should be granted.

## I.   Procedural History

The plaintiff, Lance A. Zeglen, a Pennsylvania State Police ("PSP") Trooper, commenced this civil rights action by filing a complaint against the defendants on August 31, 2004.[2]  (Doc. No. 1).  Count I advances that

---

[1]  The plaintiff and the defendant Brooke Quick have filed cross-motions for summary judgment, (Doc. Nos. 45 and 73), which will be disposed of under a separate Report and Recommendation, this day.

[2]  Eleven of the defendants are current or former employees of the PSP. The twelfth defendant, Brooke Quick, is a private citizen who participated as a witness in a PSP investigation into the plaintiff's activities.

defendants Evanko[3], Miller, Transue, Brown, and Carusone conspired to harass and intimidate the plaintiff in retaliation for his right to publicly express his opinions in violation of the First Amendment.  This allegation arises out of events beginning in 1996, where the plaintiff purportedly openly opposed a PSP policy that would disband Interstate Troop S, which the plaintiff asserts was a matter of public concern.  Count II advances a malicious prosecution claim against every defendant.  Here, the plaintiff alleges that the defendants participated in efforts to falsely investigate and bring unsupportable charges against him in retaliation for speaking out about Troop S.  In Count III, the plaintiff brings pendent state law defamation and "false light misrepresentation" claims against defendant Brooke Quick pursuant to this court's supplemental jurisdiction, 28 U.S.C. § 1367 (a).  The plaintiff seeks declaratory judgment in his favor, monetary damages, attorney's fees and costs.

On November 11, 2004, the defendants[4] filed a joint motion to dismiss Counts I and II.  (Doc. No. 9).  On September 22, 2005, the motion was ultimately granted in part and denied in part, whereby the district judge, <u>inter alia</u>, ordered that the portion of the complaint seeking damages for retaliatory actions occurring before August 31, 2002 be dismissed without prejudice.[5]

---

[3]  Paul J. Evanko was formerly terminated as a defendant on November 20, 2007.

[4]  Every defendant except Brooke Quick joined in the motion to dismiss.

[5]  All alleged retaliatory actions occurring before August 31, 2002 were deemed time barred by Pennsylvania's statute of limitations for personal

2

(Doc. No. 23).  The plaintiff did not file an amended complaint.  The same defendants filed an answer on November 10, 2005. (Doc. No. 26).[6]  On June 7, 2007, the defendants filed a motion for summary judgment, (Doc. No. 53), together with a statement of material facts, (Doc. No. 54), a brief in support, (Doc. No. 55), and multiple exhibits, (Doc. Nos. 56-57).  Specifically, they argue that the plaintiff has no evidence that defendants Miller, Transue, Brown, or Carusone took retaliatory action against him in violation of the First Amendment; that the plaintiff's malicious prosecution claim cannot be sustained because there was probable cause to file criminal charges against him and that he was not deprived of his liberty; and that the defendants are entitled to qualified immunity for the malicious prosecution claim.  (Doc. No. 55).  The plaintiff filed his brief in opposition, (Doc. No. 67), and "counterstatement" of material facts, (Doc. No. 68), on July 23, 2007.  The defendants then filed a reply brief on August 6, 2007.  (Doc. No. 70).  This matter is now ripe for disposition.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the "pleadings, depositions,

---

injury.  The court also dismissed with prejudice all allegations against defendant Gerald Pappert for reasons of qualified immunity.

[6]  The remaining procedural history relevant to defendant Brooke Quick will be outlined in the separate Report and Recommendation referenced supra in note 1.

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Casualty & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995).  At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249 ; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party.  Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323-24.  The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  In re Bressman, 327 F.3d 229, 238 (3d

Cir. 2003); <u>see also</u> <u>Celotex</u>, 477 U.S. at 325.  If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor.  <u>Boyle v. County of Allegheny</u>, 139 F.3d 386, 393 (3d Cir. 1998) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 586 (1986)); <u>see also</u> <u>Celotex Corp.</u>, 477 U.S. at 325 (stating that the non-moving party cannot simply reassert factually unsupported allegations contained in its pleadings in opposing summary judgment).  However, if the non-moving party fails to make a sufficient showing that a genuine issue of material fact exists, Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." <u>Celotex Corp.</u>, 477 U.S. at 322-23; <u>Jakimas v. Hoffman La Roche, Inc.</u>, 485 F.3d 770, 777 (3d Cir. 2007).

## III.    Undisputed Facts

From the pleadings and exhibits submitted herewith, the following facts can be ascertained as undisputed. The plaintiff, Lance Zeglen, began working for the PSP in 1985.  (Doc. No. 54-2 Ex.1 p. 5).  In February 2001, a citizen contacted Sgt. David Relph of the PSP to discuss his concern that his then-fifteen year old stepdaughter, KM,[7] was observed "kissing and 'making out' with an off-duty member [Zeglen] of the Department while attending a

---

[7] With the exception of the named defendant Brooke Quick, non-party minors are identified with initials.

community picnic" in July 2000.[8]  (Doc No. 56, Ex. 2 p.2).  The plaintiff was forty-four years old at the time he was reported to have kissed KM.  Id.  KM later confirmed this occurrence in an interview with Sgt. Relph:  "[Zeglen] ran his hands up and down my sides and over my stomach and was kissing me."[9] Id.

Based on this interview, Sgt. Relph reported what the citizen and his stepdaughter said to his troop commander, and the alleged incident was assigned to Lt. Wanda Gilbert for further investigation.  Id.  Lt. Gilbert interviewed, KM's stepsister, who attended the same picnic and observed that KM and Zeglen were making out.  Id. p.3.  KM was then interviewed a second time and reiterated, "[Zeglen] did kiss me . . . .  At the picnic when he was talking with me, he was running his hands up and down along my sides,

---

[8] Although he admits that the statement was made, the plaintiff denies its truthfulness in counterstatement #3.  (Doc. No. 68 ¶ 3).  Citing to page 5 of the Incident Report, the plaintiff states, "KM denies that she was making out with Zeglen."  Id.  However, the plaintiff does not provide any evidence to refute KM's statement; rather, the plaintiff's dispute concerns a matter of semantics.  KM clearly does not deny she was making out with Zeglen; they kissed, "but it wasn't anything like hard core making out." (Doc. No. 56 Ex. 2 p.5).

[9]  The plaintiff again denies the truthfulness of this statement, stating that "[KM] denies that the Plaintiff ever touched her breasts or rubbed up against them inadvertently." (Doc. No. 68 ¶ 5).  As to counterstatement #5, whether he touched her breasts was not a material fact proffered by the defendants.  The statement at issue is that "Zeglen had kissed her and ran his hands up and down her body." (Doc. No. 54 ¶ 5).  The plaintiff does not provide any evidence that directly counters this statement.  As such, defendant's material fact #5 is considered undisputed.

6

drunkenly touching me and it made me feel uncomfortable." Id. p.5. In her report. Lt. Gilbert concluded, "Due to the lack of solvability factors coupled with the adamant denial by the victim of the suspect having committed any crimes codes violations as initially reported, this investigation is being unfounded and terminated." Id. p.6.

In March 2001, the investigation was reopened. The PSP's Internal Affairs Division ("IAD") took over for a number of reasons, including Lt. Gilbert's failure to seek a prosecutorial decision as required by PSP Administrative Regulation 4-25, and due to the lack of investigative effort in conducting interviews of potential witnesses. (Doc. No. 54-2 Ex. 4). Defendant Brown, then-Director of the IAD, reported these findings in a memorandum to the PSP's Deputy Commissioner of Administration. Id. Defendant Brown did not know who Zeglen was until this matter came to his attention in 2001.[10] (Doc. No. 54-2 Ex. 3 pp. 12-15).

_____

[10] Although the plaintiff denies this statement of material fact, he offers absolutely no evidence from the record that supports his contention. Rather, the plaintiff merely argues that "the knowledge of Brown [] is not a statement of material fact as required by LR 56.1. To the extent that this paragraph is not objectionable, Plaintiff admits that Brown stated that he did not know Zeglen until this matter was brought to his attention." (Doc. No. 68 ¶ 16). Personal knowledge of someone or something is certainly a fact that can be considered for summary judgment purposes. United States v. Premises Known as 717 S. Woodward St., Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993) ("A statement of a person that he or she lacks or lacked knowledge of a particular matter is a statement of a 'specific fact.'"); Williams v. Vaughn, 1991 WL 193437, at *2 (E.D. Pa. Sept. 20, 1991) ("[p]ersonal knowledge is a material fact"). If the defendants' knowledge of the plaintiff and his actions in 1996 were not a material fact, then this court would not be able to resolve the

In May 2001, defendant Duby became the primary investigator into the allegations made against Zeglen.   (Doc. No. 54-2 Ex. 5 p.28).   While investigating the incident, defendant Duby interviewed  a guidance counselor at Lake Wallenpaupack High School where KM was a student, on May 31. Id. p. 30.  At the interview, the counselor mentioned that a student named Brooke told him that she and Zeglen have had sex. (Doc. No. 56 Ex. 2 p. 88); (Doc. No. 54-2 Ex. 6 pp. 9-21).  Defendant Patrick obtained a yearbook from Lake Wallenpaupack High School and determined that Brooke Quick was the only student named Brooke in the yearbook. (Doc. No. 56 Ex. 2 p. 88). Defendants Duby and Sharif interviewed the counselor again on June 6, 2001, where he confirmed that defendant Brooke Quick was the student to which he referred in the prior interview. Id. p. 99.  In the June 6 interview, the counselor recounted how defendant Quick said that she and Zeglen began a sexual relationship in late 2000 and had sex as recently as May 30, 2001. Id. During a third interview on June 12, 2001, the counselor said that he met with her several days earlier, and she said that Zeglen told her to lie if asked about their sexual relationship. Id. p. 120; (Doc. No. 54-2 Ex. 7 pp. 3-4).

Defendants Duby and Sharif interviewed defendant Quick on June 21, 2001.  She told them that she and Zeglen had sexual contact on several occasions when she was sixteen years old. (Doc. No. 54-2 Exs. 8,9); (Doc.

---

First Amendment retaliation claim.  Because the plaintiff does not cite to any countervailing evidence in the record, the defendants' statement of material fact #16 is deemed undisputed.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986) (to survive summary judgment, the non-moving party must present more than a mere scintilla of evidence supporting his claims).

No. 56 p.144).  In a second interview on June 25, defendant Quick discussed sexual acts that occurred between her and Zeglen.  (Doc. No. 5402 Exs. 10, 11); (Doc. No. 56 pp. 152-54).  With her cooperation, the PSP placed a wire intercept on a phone conversation she had with Zeglen that same day.  (Doc. No. 54-3 Ex. 12).  During the phone conversation, Zeglen never denied their sexual relationship despite numerous opportunities to do so.[11]  Id.  He also told her that she did not have to cooperate with the PSP investigation.  Id.  A second intercepted phone conversation occurred on June 26, 2001, wherein Zeglen again did not deny having sexual relations with defendant Quick. (Doc. No. 54-3 Ex. 13).

On June 27, 2001, the PSP searched Zeglen's home, boat, car, and

---

BQ: "But they're going to ask me about the sex, Lance."
LZ: "You tell them that you have nothing to say to them."
(Doc. No. 54-3 Ex. 12 p. 2).

BQ: "They've been talking to my friends."
LZ: "Let 'em talk to your friends."
BQ: "And they told them that we had sex."
LZ: "Your friends . . ."
BQ: "They know."
LZ: "None of your friends saw us do anything."  Id. p. 3.

BQ: "God, if we'd never had sex, this wouldn't of been a problem!"
LZ: "Aaahh, Brooke, aahhh."  Id. p.8.

work locker pursuant to search warrants. (Doc. No. 56 Ex. 2 pp. 161-79). The investigation continued into May 2002 when defendant Duby prepared a criminal complaint charging the plaintiff with one count of corruption of minors. (Doc. No. 54-3 Ex. 14). The complaint also contained an affidavit of probable cause, which identified several sexual acts that occurred between Zeglen and defendant Quick when she was sixteen years old. Id. Robert O'Hara, a prosecutor with the Pennsylvania Office of Attorney General, determined that there was sufficient probable cause to file the corruption of minors charge against Zeglen. Id.; (Doc. No. 54-4 Ex. 15 pp. 19, 30-31). Ultimately, Zeglen was acquitted in January 2004. (Doc. No. 1 ¶ 41).

Post-trial, the PSP treated the allegations as an administrative matter to determine whether Zeglen violated any department policies. (Doc. No. 54-3 Ex. 17 pp. 19-20). During the administrative review, Zeglen's suspension without pay—which began in May 2002—was continued in February 2004,[12] where he was also required to follow other conditions during his suspension, such as to not communicate with witnesses involved in the investigation, and to stay away from certain localities, including Lake Wallenpaupack High School. (Doc. No. 54-3 Ex. 19).

In September 2004, Zeglen was dismissed from the PSP. His dismissal

---

[12] The plaintiff was placed on suspension without pay status "due to the serious nature of alleged misconduct described [in referenced incident reports] which could reasonably be construed to result in your dismissal by the institution of court-martial proceedings. This suspension without pay status will remain in effect pending final resolution of all matters . . . ." (Doc. No. 54-3 Exs. 18,19).

was upheld by an arbitrator based in part on the testimony of Brooke Quick and testimony from another citizen's twelve year old daughter, AC, who also alleged that Zeglen made inappropriate sexual comments to her in late 2002.[13]   (Doc. No. 54-4 Ex. 24).

Zeglen claims that the defendants took the above actions against him because he spoke out on the disbanding of Troop S in 1996.  (Doc. No. 1 ¶ 46).  As stated above, defendant Brown did not know who Zeglen was until March  2001, when the KM matter arose.  Defendant Jeffrey Miller was also not aware of the Troop S matter until the plaintiff filed this lawsuit.[14]  (Doc. No.

---

[13]  In his written opinion, the arbitrator explained,

I am persuaded by the testimony that Zeglen had an inappropriate sexual relationship with Quick.  Quick's accounts – from her PSP interviews to her criminal trial and arbitration testimony – are certainly not without inconsistencies.  But those inconsistencies did not detract from the general truthfulness of her testimony.  I do not find it necessary to analyze each allegation to determine which sexual acts occurred at which time.  Although the exact details of the sexual encounters may not easily be discerned, I am convinced that the sexual encounters – inappropriate between a 46-year old man and a 16-year old girl – did occur.

(Doc. No. 54-4 Ex. 24 pp. 8-9).

[14]  Although the plaintiff denies this statement of material fact because it "refers to the Defendant's mental state," the plaintiff readily "admits that Miller was not aware of the Troop S matter until Zeglen's lawsuit was filed." (Doc. No. 68 ¶ 56).  As stated supra in note 10, knowledge of a particular matter is an acceptable material fact to be considered under Federal Rule of Civil Procedure 56 and Local Rule 56.1.  The defendants' statement of material fact #56 is therefore deemed undisputed.

54-4 Ex. 25).  Nor were defendants Transue or Carusone.[15]

## IV.    Discussion

## A.    First Amendment Retaliation

It is settled law that the First Amendment prohibits government officials

from subjecting an individual to retaliation, such as criminal prosecution, for

engaging in constitutionally protected speech.  See, e.g., Hartman v. Moore,

126 S. Ct. 1695, 1701 (2006); Perry v. Sinderman, 408 U.S. 593 (1972).  To

---

[15] In his deposition, the plaintiff claims that defendants Transue and Carusone knew who he was before the lawsuit was filed because it was "common knowledge throughout the State Police" that he was the "alleged ringleader of the Troop S slowdown." (Doc. No. 54-2 Ex. 1 pp. 13-14).  "It wasn't a big secret.  Everybody in the State Police knew about it." Id. p. 13. Although inferences must be drawn in favor of the non-moving party, "an inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990). Evidence based upon "common knowledge" and not personal knowledge is insufficient to create a genuine issue of fact and defeat summary judgment.   As the Third Circuit explained, observations that something was common knowledge are mere "beliefs" which cannot be used to resist summary judgment: "Facts made of personal knowledge are admissible.  Beliefs, no matter how sincere, are not." Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 470-71 (3d Cir. 1989) (holding that testimony to the effect that something was "common knowledge" among officers in a police department is inadmissible to identify specific police officers in a civil rights case); see also Shumway v. United Parcel Serv. Inc., 118 F.3d 60, 64 (2d Cir. 1997) (holding that plaintiff's evidence of disparate treatment based upon "common knowledge" and no personal knowledge was insufficient to establish a prima facie case of discrimination).

prove that the defendants retaliated against the plaintiff in violation of the First Amendment, the plaintiff must adduce sufficient evidence that (1) his speech is protected by the First Amendment; and (2) the protected speech was a substantial or motivating factor in the alleged retaliatory action.  Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006).  The first factor is a question of law; the second factor is a question of fact.  Id.

With respect to the first factor in Hill, a public employee's statement is protected activity if the speech involved "a matter of public concern[16] and the employee's interest in the speech outweighs the government employer's countervailing interest in providing efficient and effective services to the public."  Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004).   The public employee must also speak as a private citizen as opposed to having made the statement pursuant to his or her official duties.  Garcetti v. Ceballos, 126 S. Ct. 1951, 1959 (2006); Kruszewski v. Gorton, 2007 U.S. Dist. LEXIS 14781, at *9-10 (M.D. Pa. Mar. 2, 2007).  With respect to the second factor, a plaintiff must prove either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."  Lauren

---

[16] Speech involves a matter of public concern if it can be "fairly considered as relating to any matter of political, social or other concern to the community."  Green v. Phila. Hous. Auth., 105 F.3d 882, 885-86 (3d Cir. 1997) (internal citation omitted).  It has also been defined as "something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication."  City of San Diego v. Roe, 543 U.S. 77, 83-84 (2004).

W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997)).

The plaintiff asserts that his vocal opposition in 1996 concerning the disbandment of PSP Troop S was a matter of public concern. In his complaint, he states that former PSP Commissioner Paul Evanko's plans to disband Troop S garnered statewide media attention. (Doc. No. 1 ¶ 12).  The plaintiff himself was "particularly active in a letter writing and lobbying effort" to educate elected officials about these plans because he believed that disbandment would affect public and trooper safety. Id. ¶ 13; (Doc. No. 68 ¶ 31).  Policies that might affect public safety can fairly be considered matters of public concern, for the public surely has a right to be concerned about the safety of the community.  Although the public would not necessarily be concerned about trooper safety, see Connick v. Myers, 461 U.S. 138, 147-48 (1983) (speech relating to working conditions does not necessarily touch upon matters of public concern), given the large amount of media attention surrounding the issue, the disbandment of Troop S was properly a matter of public concern in 1996.

The plaintiff also acted as a private citizen when making his protected speech.  The act of contacting one's elected representatives to inform them of one's views and grievances is a fundamental liberty safeguarded by the Bill of Rights.  U.S. Const. amend. I; McDonald v. Smith, 472 U.S. 479, 482-83 (1985) (recognizing the well-established right of a private citizen to petition the government for redress of grievances).  It was not the plaintiff's official duty

14

as a public employee to speak out about Troop S or to write letters to the government, but these were acts performed on his own accord, motivated by his own beliefs.  Nor does the plaintiff's activity appear to have interfered with the PSP's interest in providing efficient and effective services to the public. Accordingly, the plaintiff's speech is protected under the First Amendment.

Nonetheless, the plaintiff cannot survive summary judgment on his claim that in investigating allegations made by KM and Brooke Quick, the defendants conspired to harass and intimidate him in retaliation for his making the protected speech.  Based on the pleadings and exhibits submitted, it is undisputed that the protected speech was <u>not</u> a substantial and motivating factor in the defendants' decision to proceed with their criminal investigation against the plaintiff.  This court cannot ascertain <u>any</u> causal link between the protected activity and the alleged retaliatory actions.

As a threshold matter, only those alleged retaliatory actions taking place between August 31, 2002 and August 31, 2004 can be taken into account. (Doc. No. 23).  The defendants correctly point out that only three events occurred within this time frame, and all within the year 2004. (Doc. No. 55 p. 9).  First, the plaintiff was acquitted on the criminal charge; second, the administrative proceedings began; and third, the plaintiff's suspension without pay was continued with additional restrictions.  <u>Id.</u>  It should be noted that the plaintiff was not dismissed from the PSP until after he filed the complaint.

Where the protected speech was made back in 1996, temporal proximity is not present when the alleged retaliation occurred six to eight years later.

15

See Estate of Smith v. Marasco, 318 F.3d 497, 512-13 (3d Cir. 2003) (holding that the passing of two days is unusually suggestive of retaliatory motive, but the elapse of nineteen months is not).  Events occurring after August 31, 2002 are so far removed from what happened in 1996 that they are not remotely suggestive of any intent to retaliate against the plaintiff.    N o r   i s   t h e r e   a pattern of antagonism that, when viewed in light of the timing of the alleged retaliatory events, could reasonably convince a jury of a causal link.  The fact that the PSP sought to determine whether the plaintiff violated PSP field regulations cannot be viewed as antagonism for events which occurred in 1996, but as a required course of administrative action within the department.  PSP field regulation FR 1-1.02 prohibits "[u]nbecoming conduct . . . which could reasonably be expected to destroy public respect for PSP officers and/or confidence in the Department," and FR 1-1.28 requires an internal investigation for every complaint received in connection with police misconduct. (Doc. No. 54-4 Ex. 24 p.4).  Even though the plaintiff was acquitted of corruption of minors, he still might have violated FR 1-1.02.  As such, the internal administrative case against the plaintiff cannot be part of any pattern of antagonism.

Moreover, the additional restrictions placed upon the plaintiff in February 2004 all relate to his criminal case.  (Doc. No. 54-3 Ex. 19).  Hundreds of pages of police reports were generated and filled with many allegations of sexual misconduct on the part of the plaintiff.  See Doc. No. 56.  With respect to the key witnesses in the case, the restrictions seemed perfectly reasonable:

The plaintiff could not communicate with, harass or stalk Brooke Quick, KM, and other witnesses or members of their families; he cannot appear on the grounds of the Wallenpaupack Area School District or within 1,000 feet of the Wallenpaupack Area High School; he could not interfere with or impede the administrative investigation; and must follow other conditions as well. (Doc. No. 54-3 Ex. 19). Because the plaintiff was required to follow these conditions "due to the serious nature of alleged misconduct," id., and not for any other reason, the PSP's actions in continuing his suspension without pay were not part of any pattern of antagonism.

In his opposition brief, the plaintiff argues that a reasonable jury could find against defendants Miller and Brown for actions that occurred before August 31, 2002, and against defendants Transue and Carusone for placing the additional restrictions on his movement and allowing such discipline to occur. (Doc. No. 67 pp. 13-14).  Yet Miller and Brown's actions occurred outside of the relevant time frame; and nowhere do Transue's or Carusone's names or signatures appear on either of the memoranda imposing restrictions on the plaintiff – rather, the only name in the "From" line is that of Commanding Officer Joseph T. Marut, who is not a defendant in this case. See (Doc. No. 54-3 Exs. 18, 19).  In addition, none of the defendants named in Count I of the complaint admitted that they retaliated against the plaintiff because of his outspoken views on Troop S.

The plaintiff provides no admissible evidence to suggest that the defendants retaliated against him.  As stated supra in note 15, the plaintiff's

17

beliefs that it was "common knowledge" among the PSP that Lance Zeglen was a ringleader in the Troop S matter are not sufficient to create a genuine issue of fact. Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989) (holding that the non-moving party cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid a motion for summary judgment) (citing Celotex v. Catrett, 477 U.S. 317 (1986)).  Absent evidence that the defendants knew about the plaintiff's protected speech, "a substantial gap [exists] in any causal chain suggested [even] by temporal proximity." Walsh v. Wal-Mart Stores, Inc., 200 F. App'x 134, 137 (3d Cir. 2006) (internal citation omitted).  Because the plaintiff has failed to create a genuine issue of material fact, and because this court is not required to sift through the record to determine whether he has a viable claim, judgment should be granted to the defendants with respect to the First Amendment retaliation claim of Count I.[17]

## B.   Malicious Prosecution

---

[17]   This court notes that the Third Circuit has specifically cautioned district courts against allowing unsubstantiated First Amendment retaliation claims against police officers to proceed to trial, stating:

> [O]fficers should not by reason of potential civil liability be discouraged from intervening when their services are needed by the not surprising circumstances that a claim has been lodged against a person with whom they have had previous adverse dealings.  Society may pay a high price if officers do not take action when they should do so.

Marasco, 318 F.3d 497, 513 (3d Cir. 2003); Hines v. Proper, 442 F. Supp. 2d 216, 223 n.7 (M.D. Pa. 2006).

In Count II of his complaint, the plaintiff alleges, to wit:

> The defendants above named all participated in efforts as specified in the complaint above to falsely investigate and bring charges against plaintiff which were unsupported and unsupportable and which were designed to retaliate against the plaintiff for speaking out on matters of public concern in violation of his Fourth Amendment right to be free of malicious prosecution's [sic] and unlawful searches and seizures.[18]

(Doc. No. 1 ¶ 48).  To prevail on a claim of malicious prosecution under the Fourth Amendment, the plaintiff must prove the following elements:

1. the defendant initiated the criminal proceeding;
2. the criminal proceeding ended in plaintiff's favor;
3. the defendant initiated the proceeding without probable cause;
4. the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and
5. the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

Johnson v. Knorr, 477 F.3d 75, 81-82 (3d Cir. 2007).  While the defendants do not deny that criminal proceedings terminated in the plaintiff's favor, they dispute the existence of the remaining elements.

The defendants argue that everyone except Duby must be excised from this claim based upon the first element, because only Duby initiated the criminal proceeding by signing the criminal complaint and affidavit of probable cause.  (Doc. No. 55 p. 13).  However, the malicious prosecution claim against Duby cannot be sustained because there was sufficient probable cause to charge the plaintiff with corruption of minors, and the prosecution did

---

[18]   Even though the Fourth Amendment applies to the defendants through the Fourteenth Amendment, this court will refer to the plaintiff's claim as arising under the Fourth Amendment. See Donahue v. Gavin, 280 F.3d 371, 372 n.1 (3d Cir. 2002).

not cause any additional loss of liberty. Id. pp. 12-15. The defendants alternatively argue that they are entitled to qualified immunity. Id. p. 16. In response, the plaintiff argues that "initiation of criminal proceedings" involves more than just signing the complaint; rather, anyone who helped conduct or assist with the investigation leading up to the complaint is included under this category. (Doc. No. 67 pp. 15-16). He asserts that the defendants ignored any lack of probable cause so they could punish him for speaking out on a matter of public concern, and that he was deprived of his liberty and freedom when the defendants placed various restrictions upon him. Id. The plaintiff also denies that the defendants are entitled to qualified immunity. Id. pp. 16-17.

The Restatement (Second) of Torts § 654 cmt. c (2007) states that criminal proceedings are generally instituted "by the issuance of some form of process, generally a warrant for arrest, the purpose of which is to bring the accused before a magistrate in order for him to determine whether the accused shall be bound over for further action by a grand jury or for trial by a court." See also Freeman v. Murray, 163 F. Supp. 2d 478, 490 (M.D. Pa. 2001). The return of an indictment, the filing of an information, or the lawful arrest of the accused also mark the institution of criminal proceedings. Id.

In most circumstances, police officers cannot initiate criminal proceedings; rather, the prosecutor causes the proceedings to occur. See, e.g., Turner v. McCollum, 2007 U.S. Dist. LEXIS 11476, at *11-12 (E.D. Pa. Jan. 31, 2007); O'Connor v. City of Phila., 2006 U.S. Dist. LEXIS 34455, at *7-

8 (E.D. Pa. May 26, 2006); Harris v. City of Phila., 1998 U.S. Dist. LEXIS 12640, at *5 (E.D. Pa. Aug. 14, 1998) (citing Albright v. Oliver, 510 U.S. 266, 279 n.5 (1994) (Ginsburg, J., concurring)).  When the prosecutor makes an independent decision to seek a warrant or to return an indictment, he or she breaks the causal chain between the officer's conduct and the criminal proceedings, thereby insulating the officer from any claim for malicious prosecution.  Houston v. City of Phila., 2007 U.S. Dist. LEXIS 40026, at *21 (E.D. Pa. May 31, 2007) (internal citation omitted).  Only if a police officer knowingly withholds facts or provides false information to the prosecutor, which prevents the prosecutor from making an informed decision, can the officer be said to have "initiated" criminal proceedings and be liable for malicious prosecution.  Stango v. Rodden,2001 U.S. Dist. LEXIS 15728, at *12 (E.D. Pa. Aug. 21, 2001).

In this case, it was Robert O'Hara, a senior deputy attorney general with the Pennsylvania Office of Attorney General, who made the ultimate decision to file charges.  (Doc. No. 54 ¶ 37).  After reviewing the case file, conducting research, and discussing the case with his superior, Mr. O'Hara testified that "I believe I was actually the person who approved the criminal complaint." (Doc. No. 54-3 Ex. 15 pp. 19).   He also testified that "I made a recommendation ultimately that charges be filed; that recommendation is made to my superior and then ultimately I received confirmation from him, authorization to go ahead and file the charges [in May 2002]."  Id. p.30.  In fact, Mr. O'Hara reviewed defendant Duby's affidavit of probable cause for

21

any errors. Id. p. 31.  As such, Mr. O'Hara initiated the criminal proceedings; yet Mr. O'Hara is not a defendant in the case.  The court must therefore determine whether any of the named defendants knowingly withheld facts or provided false information to Mr. O'Hara.

In his counterstatement of material facts, the plaintiff only refers to four defendants who allegedly interfered with Mr. O'Hara's prosecutorial discretion. He claims that defendants Saites and Rain filed false reports, (Doc. No. 68 ¶ 32), and that defendants Duby and Sharif failed to complete and record full interviews, filed false reports, obstructed justice and withheld evidence from the Attorney General's office and Plaintiff's attorney, id. ¶¶ 19, 31-32. However, the evidence the plaintiff offers in support of these claims comes from his own deposition, (Doc. 47-2 Ex. 1), and from his complaint verification form, id. Ex. 8.  With respect to defendant Sharif, for example, the plaintiff testified in his deposition as follows:

> I believe that Corporal Sharif filed reports and I believe he filed false reports to cover himself for that because I believe he absolutely did remember talking to Joseph Nastasia . . . . So I believe.  I believe they were purposely not included and he filed reports right at the very end to cover his tracks for not doing them.

(Doc. No. 47-2 Ex. 1 p. 77).  See also id. p. 53 ("I believe Corporal Duby also failed to report interviews . . . .").

As the Supreme Court stated, Federal Rule of Civil Procedure 56(e) requires the non-moving party to go "beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial"; simply reasserting factually unsupported allegations contained in the pleadings is not

sufficient.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986).  Here, the plaintiff is doing just that – in his deposition and complaint verification form, he is reasserting the same unsupported allegations contained in his complaint. Such evidence clearly cannot be used to create a genuine issue of fact that the defendants knowingly withheld facts or provided false information to Mr. O'Hara.   Moreover, that it was the plaintiff's "belief" that certain defendants behaved in such a manner is not admissible evidence.  See supra note 15. Accordingly, the plaintiff has failed to prove the first element of malicious prosecution.

Even if some of the defendants were found to have initiated criminal proceedings, a reasonable jury would still be able to find that the defendants had sufficient probable cause to charge the plaintiff with one count of corruption of minors.  The Third Circuit has stated that "[p]robable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested."  Morales v. Taveras, 2007 U.S. Dist. LEXIS 4081, at *23 (E.D. Pa. Jan. 19, 2007) (quoting United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002); see also Gerstein v. Pugh, 420 U.S. 103, 111-12 (1975) (holding that a police officer has probable cause if the facts and circumstances are "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense") (internal citation omitted).  Yet "[b]ecause many situations which confront officers in the course of executing

their duties are more or less ambiguous, room must be allowed for some mistakes on their part.  But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." Freeman v. Murray, 163 F. Supp. 2d 478, 485 (M.D. Pa. 2001) (quoting Gerstein, 420 U.S. at 112 (internal citation omitted)).  As long as the mistakes were not motivated by personal malice, bias, or revenge, police officers are not liable for their honest errors. Bruch v. Clark, 507 A.2d 854, 856 (Pa. Super. 1986). Moreover, under Pennsylvania law, "an attorney's advice conclusively establishes probable cause if the advice is sought in good faith and the advice is given after full disclosure of the facts." Kelley v. Gen. Teamsters, 544 A.2d 940, 941 (Pa. 1988) (emphasis in original); see also Gleeson v. Robson, 2005 U.S. Dist. LEXIS 43310, at *83 (M.D. Pa. May 6, 2005); Williams v. Fedor, 69 F. Supp. 2d 649, 670 (M.D. Pa. 1999).

Allowing room for honest mistakes, the evidence collected by the PSP more than supports a finding of probable cause that the plaintiff engaged in the corruption of a minor female.  In response to the allegations made against the plaintiff, the PSP launched an extensive investigation.   During the investigation, the PSP received reports that the plaintiff would park outside the Wallenpaupack High School and would watch the female students. (Doc. No. 56 Ex. 2 p. 8).  Lt. Wanda Gilbert decided to query the plaintiff's police activity from January 2001 to March 2001 and learned that out of the 134 incidents handled by him, 99 were related to or occurred on the grounds of the Wallenpaupack high school, middle school, and even elementary school. Id.;

24

(Doc. No. 54-2 Ex.4).   The PSP also conducted a series of interviews with KM, Brooke Quick, and other witnesses.  In a June 21, 2001 interview with Brooke Quick, the PSP learned of many instances in which the plaintiff allegedly touched her in an improper manner.  For example, Quick stated,

> We went off [on the plaintiff's boat] like as if I was just going for a ride.  And I was commenting, "Wow, this is nice."  And then he stopped.  And I sat down in the back.  It's got this big sun deck.  And I was just sitting there, and he came over and sat next to me and he started kissing me.  And I didn't want to because I knew it was in a place where I could get myself into something bad, but I didn't stop.  And I pushed him away, and I said, "No, no, no.  I don't want to do this," and he looked at me and said, "Why are you being this way" You would want to do this any other time, why are you doing this? Come on, it's not gonna hurt anything, just do it."  So, I kind of felt bad, and he did and I let him finger me.

(Doc. No. 54-2 Ex. 8 p. 13).  Brooke Quick also described the interior of the plaintiff's bedroom, id. p. 21, and the fact that he had a piece of palm from Palm Sunday by his bed, id. Ex. 10 p. 3.  In executing a search warrant upon the plaintiff's residence, the PSP discovered that the layout of the bedroom as well as the presence of a palm leaf were consistent with Quick's description.  (Doc. No. 56 Ex. 2 pp. 168, 173).  Although the plaintiff disputes Quick's allegations, during the wiretapped conversations, he failed to deny any sexual relationship despite numerous opportunities to do so, and he also continued to urge her not to talk to Internal Affairs, which severely undermines his assertion that she fabricated their sexual relationship.  See (Doc. No. 54-3 Exs. 12-13). In the sworn affidavit of probable cause, defendant Duby recounted, inter alia, the various sexual encounters that Brooke Quick stated she had with the plaintiff.  (Doc. No. 54-3 Ex. 14).  The prosecutor, Deputy

25

Attorney General Robert O'Hara, then made a recommendation that charges be filed, and his superior ultimately authorized him to proceed. (Doc. No. 54-3 Ex. 15 p.30). Based on all of the evidence collected coupled with the Attorney General's recommendation, the PSP had sufficient probable cause to charge the plaintiff with an offense. <u>See</u> (Doc. No. 56 Ex. 2).

Because the plaintiff has failed to prove both the first and third elements for a claim of malicious prosecution, and all elements must be proven for such claim to survive, there is no need to discuss anything further regarding this claim. Judgment should therefore be granted to the defendants with respect to the malicious prosecution claim of Count II. Moreover, in light of the recommendation, the issue of whether the defendants have qualified immunity need not be discussed.

## V.    Conclusion

Based on the foregoing, it is **HEREBY RECOMMENDED THAT:** defendants Miller, Transue, Duby, Sharif, Titler, Saites, Brown, Patrick, Rain, and Carusone's. motion for summary judgment, **(Doc. No. 53)**, as to Counts I and II of the complaint, **(Doc. No. 1)**, be **GRANTED**.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

Date: November 30, 2007

26

O:\shared\REPORTS\2004 Reports\04-1940.02.wpd