# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LANCE A. ZEGLEN,** | : | **No. 3:04cv1940** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **JEFFREY MILLER,** | : | |
| **CYNTHIA TRANSHUE,** | : | |
| **JOHN DUBY,** | : | |
| **FARZAD SHARIF,** | : | |
| **BARRY TITLER,** | : | |
| **NICHOLAS SAITES,** | : | |
| **RICK BROWN,** | : | |
| **MICHAEL PATRICK,** | : | |
| **GARRETT RAIN,** | : | |
| **CHRISTOPHER CARUSONE, and** | : | |
| **BROOKE QUICK,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court are the reports and recommendations (Doc. 78-79) of

Magistrate Judge Malachy E. Mannion, which propose that we grant in part and deny

in part various summary judgment motions filed on the claims and counterclaims in

this case.  Having been fully briefed and argued, the matters are ripe for disposition.

## I. Background

This case involves delicate matters surrounding the relationship between the

plaintiff, a forty-four-year-old Pennsylvania State Patrol Officer and Brooke Quick, a

sixteen-year-old high school student.  Plaintiff Lance A. Zeglen became a member of

the Pennsylvania State Police in 1985 (Defendants' Statement of Undisputed

Material Facts (Doc. 54) (hereinafter "Defendants' Statement) at ¶ 1).[1]  Sometime in

2001, a citizen named Robert Morgan contacted State Police Sargent David Relph

at the State Police's Blooming Grove Station, seeking a meeting.  (Id. at ¶ 2).  The

two met on February 16, 2001.  (Id. at ¶ 3).  At that meeting, Morgan reported that

his stepdaughter, Kimberly Miller, had been observed kissing the plaintiff at a

community picnic the previous summer.[2]  (Id.).  Miller was fifteen years old at the

time.  (Id.).  Zeglen was forty-four years at the time.  (Id.).  In an interview with Relph,

Miller admitted that she had kissed Zeglen.  (Id. at ¶ 5).  The parties disagree over

whether and to what degree Miller claimed that Zeglen touched her body.  (Id. at ¶

5); (Plaintiff's Counterstatment of Material Facts (Doc. 68) (hereinafter "Plaintiff's

Statement" at ¶ 5).[3]

Relph reported these allegations to the commander of his troop, who assigned

Lieutenant Wanda Gilbert to investigate.  (Id. at ¶ 6).  Gilbert interviewed Miller's

stepsister, Hillary Morgan, who reported that she had observed Miller drinking and

---

[1]We will cite to the defendants' statement for matters which are not in dispute.
When matters are in dispute we will note that and use the evidence provided by the parties
to resolve those disputes, where possible.

[2]Plaintiff admits that Morgan made these statements, but denies that he had "made
out" with Zeglen.  (Plaintiff's Counterstatement of Material Facts (hereinafter "plaintiff's
statement" (Doc. 68) at ¶ 3).

[3]Plaintiff contends that "Miller denies that the Plaintiff ever touched her breasts or
rubbed up against them inadvertently."  (Plaintiff's statement at ¶ 5).  We note that the
defendants' statement does not allege that plaintiff touched Miller's breasts, but that he ran
his hands along the sides of her body.  A jury could consistently believe both of these
statements.

"making out" with Zeglen on the day in question.  (Id. at ¶ 7).[4]  Gilbert also

interviewed Miller, who admitted that she had kissed Zeglen, and that he had come

to her place of work a day or two later and asked her not to discuss the incident with

anyone.  (Id. at ¶ 8).[5]  Miller also alleged that Zeglen had run his hands up and down

her sides and had made her feel uncomfortable.  (Id. at ¶ 9).  The parties disagree

about the extent of the contact between the Zeglen and Miller.[6]  Despite these

allegations, Gilbert concluded in her report that "due to the lack of solvability factors

coupled with the adamant denial by the victim of the suspect having committed any

crimes codes violations as initially reported," the investigation would be "terminated."

(Id. at ¶ 10).

       After Gilbert's initial investigation, John R. (Rick) Brown, a Pennsylvania State

Police Captain and Director of the Division of Internal Affairs in the Bureau of

Professional Responsibility, reviewed Gilbert's work and reported to a superior that

he disagreed with her conclusions.  (Id. at ¶¶ 11-12).  Brown contended in part that

Gilbert's investigation was flawed because she had failed to seek the opinion of a

---

[4]Plaintiff agrees that Morgan made this statement, but suggests that she may have manufactured her claims to create "rumors and gossip."  (Plaintiff's statement at ¶ 7).

[5]Plaintiff insists that this conversation centered around "rumors and innuendo" about them that he claimed had to stop.  (Plaintiff's Statement at ¶ 8).  He contends that Miller denied "anything had happened between the two," and that plaintiff told her rumors said otherwise.  (Id.).

[6]Plaintiff again contends that Miller denied plaintiff "touched her breasts or rubbed up against them inadvertently."  (Plaintiff's Statement at ¶ 9).  He also contends that Miller was drunk at the time of the alleged incident, and that she was known to use illegal drugs.  (Id.).  He provides no evidence to support these claims.

prosecutor as required in State Police administrative regulations.  (Id. at ¶ 13).

Brown also worried that Gilbert had not interviewed potential witnesses.  (Id. at ¶ 14).

Brown suggested that the State Police reopen the criminal investigation, conduct a

thorough inquiry, and submit their findings to the district attorney for a written

prosecutorial decision.[7]  (Id. at ¶ 15).  Brown did not know Zeglen when he

conducted the investigation.  (Id. at ¶ 16).

When confronted with Brown's recommendations, Zeglen's troop commander

suggested that any further investigation should be handled by the Internal Affairs

division.  (Id. at ¶ 17).  The troop commander felt that the troop would have difficulty

carrying out such an investigation.  (Id.).  Trooper Robert Jones received the initial

assignment on the matter, but personal reasons intervened and he was replaced by

Corporal John Duby.  (Id. at ¶ 18).  Duby became the primary investigator in May

2001.  (Id. at ¶ 19).  During the course of this investigation, Duby interviewed John

Tobey, a guidance counselor at Lake Wallenpaupak High School, where Miller was a

student.  (Id. at ¶ 20).  Tobey informed Duby that a student at the high school named

---

[7]Plaintiff denies this statement, contending that it represents opinion and not fact.
The defendants' statement accurately reflects the contents of the document to which it
refers, which states Brown's opinion and recommendation on the matter.  The document
states: "This officer strongly believes this criminal investigation should be reopened and
thoroughly investigated.  The investigation should then be submitted to the District Attorney
for a written prosecutorial decision in accordance with Reference (a).  Failure to do
otherwise further victimizes the juvenile and her family."  (See Exh. 4 to Defendants'
Statement).

Brooke had informed him that she had sex with plaintiff. (Id. at ¶ 21).[8]  Obtaining a

yearbook for the high school, Lieutenant Michael Patrick determined that the only

student in the school named Brooke was Brooke Quick. (Id. at ¶ 22).  Armed with

that information, Duby and Corporal Farzad Sharif reinterviewed Tobey on June 6,

2001. (Id. at ¶ 23).  Tobey confirmed that Quick was the student in question, and

that she had told him that Zeglen and Quick had a sexual relationship beginning in

late 2000. (Id. at ¶¶ 23-24).  The two had sexual intercourse as recently as May 30,

2001. (Id. at ¶ 24).  Tobey also reported that Quick told him that Zeglen had

instructed her to lie if anyone asked her about their relationship. (Id. at ¶ 25).[9]

    Duby and Sharif interviewed Quick on June 21, 2001. (Id. at ¶ 26).  She told

them that she had sexual contact with Zeglen several times when she was sixteen

years old. (Id.).  At a second interview, on June 25, 2001, Quick confirmed that she

engaged in sexual acts with the plaintiff. (Id. at ¶ 27).  Investigators then arranged a

"consensual intercept" of a conversation between Zeglen and Quick. (Id. at ¶ 28).  In

a conversation shortly after June 25, 2001, Zeglen did not deny to Quick that they

had a sexual relationship. (Id.).  Instead, he reminded her that she did not have to

cooperate with the investigation. (Id.).  Zeglen again failed to deny the relationship

---

[8]Plaintiff emphasizes that Quick admitted in her deposition that the sex was consensual, and that a dispute arose between the two when she concluded that the love she felt for the plaintiff was unrequited. (Plaintiff's Statement at ¶ 21).

[9]Plaintiff denies that he instructed Quick to lie about their relationship or attempted to interfere with the investigation, instead he claims that he simply hoped she would not be interviewed because he knew the traumatic nature of such questioning. (Plaintiff's Statement at ¶ 25).

during a second such intercept.  (Id. at ¶ 29).

On July 27, 2001, the Pennsylvania State Police executed a search warrant on plaintiff's home, boat, car and locker at work.  (Id. at ¶ 30).[10]  Duby prepared a criminal complaint in May 2002 that charged plaintiff with one count of corruption of minors.  (Id. at ¶ 31).  The complaint contained an affidavit of probable cause signed by Duby.  (Id. at ¶ 32).  The affidavit identified several acts of sexual contact between Quick and the plaintiff.  (Id. at ¶ 33).  The parties agree that Quick admitted that such acts occurred, though plaintiff contends that investigators had been made aware of Quick's poor reputation for truth and honesty by those who knew her.  (Defendants' Statement at ¶ 34; Plaintiff's Statement at ¶ 34).  The parties also agree that Quick claimed that she had expressed to Zeglen her desire not to engage in sexual contact during their first encounter and that plaintiff had persuaded her to

---

[10]Plaintiff disputes that the State Police had probable cause to obtain the warrant, and alleges that Duby removed items not subject to the warrant from plaintiff's home and never returned them.  (Plaintiff's Statement at ¶ 30).  As evidence of the illegality of the search warrant, plaintiff points only to his deposition, where he contends that "[a] Judge approved it so I'm not gonna dispute the Judge's findings.  The Judge approved it, but that part of it was illegal.  I don't remember recalling the exact paperwork to see as to say if their ducks were in a row.  I mean I believe that the information they retrieved to get the Judge to sign it was I don't think there was enough there.  I think they didn't obtain enough information for the search warrant.  Judge signed it.  Do I believe they had enough information?  No I don't and I believe they pushed and pressured the Judge on that I believe on a golf course to sign it."  (Plaintiff's Deposition, Exh. 1 to Plaintiff's Statement (hereinafter "Plaintiff's Dep.") at 39).  Here, plaintiff admits he has no factual basis for his contention that the warrant was not issued pursuant to probable cause, but insists that he believes the warrant was improper.  Mere statements of opinion, unsupported by any factual basis, are not evidence which could be used to convince of jury that a fact is more likely true than not.

consent to the contact by making her feel guilty.  (Defendants' Statement at ¶ 35).[11]

Robert O'Hara, a prosecutor in the Pennsylvania Office of Attorney General, reviewed the complaint and eventually concluded that sufficient probable cause existed to charge plaintiff with corruption of minors under Pennsylvania law.  (Id. at ¶ 37).  The parties disagree over whether O'Hara came to this conclusion independently, or was pressured by the State Police to bring charges.  (See Plaintiff's Statement at ¶ 37).[12]  In any case, a preliminary hearing occurred before District Magistrate Judge William Sanquilly on August 6, 2002.  (Id. at ¶ 38).  An attorney represented plaintiff at the hearing.  (Id. at ¶ 39).  His lawyer cross-examined Quick, who testified that she and Zeglen engaged in sexual acts when she was sixteen years old.  (Id. ¶¶ 40-41).  After this testimony, plaintiff's lawyer moved to dismiss the charges, but the judge ordered the case bound over for trial.  (Id. at ¶ 42).  Zeglen was acquitted after a trial in January 2004.  (Id. at ¶ 44).

After the trial ended, the State Police determined to treat the allegations against Zeglen as an administrative matter.  (Id. at ¶ 45).  The State Police continued plaintiff's suspension without pay while they investigated the allegations against him, and also instituted other restrictions on where plaintiff could go in public.  (Id. at ¶¶ 46, 49; Plaintiff's Statement at ¶ 46).  Those restrictions also included a

---

[11]Plaintiff denies the truth of Quick's statements in regard to this matter.

[12]As support for his position, plaintiff cites only to hearsay statements by defense investigators that he referenced in his deposition.  (See Plaintiff's Dep. at 92-93).  Plaintiff does not indicate on what grounds these statements would be admissible at trial.

ban on speaking with any witnesses involved in the case.  (Defendants' Statement at ¶ 47).  Prior to issuing these restrictions, the State Police had received various reports that plaintiff or his girlfriend had contacted witnesses in the case and attempted to influence their testimony.  (Id. at ¶¶   49-52).  Plaintiff admits that the Police had received such reports, but denies he engaged in such conduct or was aware that anyone else had.  (Plaintiff's Statement at ¶¶ 49-52).  Eventually, after testimony from Quick and another witness who claimed plaintiff had touched her daughter inappropriately, the State Police dismissed plaintiff from his employment. (Id. at 53).  An arbitrator upheld this dismissal.  (Id.).  Plaintiff maintains he was dismissed because he protested proposals to disband Troop S of the Pennsylvania State Police.  (Id. at ¶ 54

On August 31, 2004, plaintiff filed a complaint in this court.  (Doc. 1).  Count I of the complaint, raised against Defendants Pappert, Miller, Evanko[13], Traunsue, Carusone and Brown, states a claim for first amendment retaliation pursuant to 42 U.S.C. § 1983.  Plaintiff alleges that after he spoke out on a matter of public concern the defendants retaliated against plaintiff by bringing unfounded charges and engaging in harassing searching and investigations of him.  Count II raises claims of malicious prosecution in violation of his rights under the Fourth Amendment to the United States Constitution against all of the defendants.  Count III alleges defamation and false light misrepresentation under Pennsylvania law against Brooke

---

[13]The parties later agreed to dismiss Defendant Evanko from the case.

Quick.  After the parties briefed and this court granted in part and denied in part a

motion to dismiss, the defendants filed answers in the case.  Brooke Quick's answer

(Doc. 30) includes counterclaims pursuant to federal and Pennsylvania law.  Count I

of the counterclaim alleges that the state police defendants illegally allowed the

plaintiff to engage in inappropriate sexual behavior with Quick in violation of 42

U.S.C. §§ 1983 and 1988. Count II asserts that the counterdefendants conspired to

deprive Quick of her constitutional right to equal protection of the laws.  Count III

alleges that the Pennsylvania State Police had a policy or custom of allowing

behavior similar to the plaintiff's in violation of 42 U.S.C. §§ 1983 and 1988.  Count

IV of the countercomplaint alleges assault and battery related to the sexual conduct

between Zeglen and Quick.  Count V accuses plaintiff of inflicting emotional distress

on Quick.  Count VI claims that plaintiff had falsely imprisoned her in violation of

state law.

The parties then engaged in discovery.  After the close of discovery, plaintiff

filed a motion for summary judgment of Defendant Quick's counterclaims.  (Doc. 45).

The State Police Defendants also filed a motion for summary judgment on plaintiff's

claims.  (Doc. 53).  Defendant Quick filed a motion for summary judgment (Doc. 73),

although her brief in support of that motion actually serves as a brief in opposition to

plaintiff's motion for summary judgment on her counterclaims.  (See Doc. 75).  The

parties briefed those motions.

In two separate opinions, Magistrate Judge Mannion recommended that we

9

grant the state police's motion for summary judgment on the first two counts of

plaintiff's complaint and that we grant summary judgment to the plaintiff on the

federal claims in Defendant Quick's countercomplaint. The magistrate judge

suggested that we dismiss Defendant Quick's cross-claim against five defendants

not named in the original lawsuit.  Quick never provided proof of service for those

five additional defendants, and the deadline for perfecting service on those

defendants had long since passed.  In addition, the magistrate judge found that

Quick filed no brief in opposition to plaintiff's motion for summary judgment on

Counts I, II and III of her counterclaim, and therefore recommended that we grant

the plaintiff's motion as it pertained to those federal counts.[14]  At the same time, the

magistrate judge recommended that we grant summary judgment to the plaintiff on a

portion of Quick's assault and battery counterclaim and deny summary judgment on

her remaining state-law claims.  If we followed the magistrate judge's

recommendations, Plaintiff's state-law claim against Brooke Quick and Brooke

Quick's remaining state-law counterclaims would remain in the case.  Plaintiff then

---

[14]Defendant Quick filed no objections to the report and recommendation, and we therefore examine this finding only to determine whether a review of the record evidences plain error or manifest injustice.  See, e.g., Sullivan v. Cuyler, 723 F.2d 1077, 1085 (3d Cir. 1983); FED. R. CIV. P. 72(b) 1983 Advisory Committee Notes ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record to accept the recommendation"); 28 U.S.C. § 636(b)(1).  Here, we find no such plain error or manifest injustice, and we will adopt the recommendation to dismiss Counts I, II and III of the counterclaim, as well as the recommendation that we deem her motion for summary judgment against the plaintiff withdrawn for failure to file supporting materials.

filed objections to the report and recommendation and defendants filed a brief in opposition, bringing the case to its present posture.

**Jurisdiction**

As this case is brought pursuant to 42 U.S.C. §§ 1983, we have jurisdiction under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). We have supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

**Legal Standard**

In disposing of objections to a magistrate judge's report and recommendation, the district court must make a *de novo* determination of those portions of the report to which objections are made. 28 U.S.C. § 636 (b)(1)(C); see also Henderson v. Carlson, 812 F.2d 874, 877 (3d Cir. 1987). This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The district court judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. Id.

For those portions of the report and recommendation to which no objections have been filed, we must determine whether a review of the record evidences plain error or manifest injustice. See, e.g., Sullivan v. Cuyler, 723 F.2d 1077, 1085 (3d Cir. 1983); Fed. R. Civ. P. 72(b) 1983 Advisory Committee Notes ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the

face of the record to accept the recommendation"); 28 U.S.C. § 636(b)(1).

For reasons which shall become clear in the course of our opinion, we shall first

address plaintiff's claims of First Amendment Retaliation and Malicious Prosecution,

which constitute the federal causes of action in this case.

### i. First Amendment Retaliation

Plaintiff contends that the magistrate judge erred in recommending that the

court grant summary judgment to the defendants on his first amendment retaliation

claim.  The Supreme Court has held that "[o]fficial reprisal for protected speech

'offends the Constitution [because] it threatens to inhibit exercise of the protected

rights,' and the law is settled that as a general matter the First Amendment prohibits

government officials from subjecting an individual to retaliatory actions, including

criminal prosecutions, for speaking out."  Hartman v. Moore, 547 U.S. 250, 256

(2006) (quoting Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998)).  To establish

a First Amendment retaliation claim, a plaintiff must show "that [plaintiff] engaged in

protected activity; (2) that the government responded with retaliation; and (3) that the

protected activity was the cause of the retaliation."  Estate of Smith v. Marasco, 318

F.3d 497, 512 (3d Cir. 2003).

The magistrate judge found that plaintiff spoke on a matter of public concern

when he complained about the staffing decisions made by the State Police.  When

the speaker in question is a public employee, that speech "is protected activity when

(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter

12

of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made.'" Id. at 241-42 (quoting Garcetti v. Ceballos, 126 S. Ct. 1951, 1958 (2006)).  The parties do not disagree with this finding, and we likewise conclude that plaintiff's speech addressed a matter of public concern, and that plaintiff spoke as a private citizen in raising those issues.

The magistrate judge found, however, that the second of the factors enunciated in Hill, that the protected speech was a substantial or motivating factor in the retaliatory action, could not be proved with the evidence in the case.  To show "the requisite causal connection [between a plaintiff's speech and a defendant's conduct, a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).  If a plaintiff has no such causal proof, "the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of the fact should infer causation." Id. (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000)).  In that situation, "courts may look to the intervening period for other evidence of retaliatory animus." Krouse v. American Sterilizer Co., 126 F.3d 494, 504 (3d Cir. 1997).

Here, at least five years passed between plaintiff's protected activity and any

13

actions by the defendants for which they could be liable.[15]  Plaintiff testified that he

complained of State Police plans for Troop S in 1996 and 1997.  (Doc. 54-2 Exh. 1 at

9).  The State Police investigation of plaintiff's alleged behavior with teenage girls

began in 2002.  Investigations involving the plaintiff continued into 2004, when the

State Police suspended him without pay and placed restrictions on his public activity

during an investigation that followed his acquittal on the criminal charges. The Third

Circuit Court of Appeals has emphasized that "'even' if timing alone could ever be

sufficient to establish a causal link, . . . the timing of the alleged retaliatory action

must be 'unusually suggestive' of retaliatory motive before a causal link will be

inferred.'" Estate of Smith, 318 F.3d at 512 (quoting Krouse, 126 F.3d at 503).  The

years that passed between the protected activity and the alleged retaliatory conduct

mean that the timing of the events in the case was not "unusually suggestive" of a

retaliatory motive.  See Estate of Smith, 318 F.3d at 512-13 (finding that courts have

concluded that an inference of retaliatory motive was appropriate "where two days

passed between the protected activity and the alleged retaliation," but that a lapse of

nearly two years did not.).  We cannot therefore infer that defendants' conduct was

retaliatory.

Still, "timing plus other evidence may be an appropriate test where the

_____

[15]In an earlier decision, this court concluded that only those retaliatory actions which occurred between August 31, 2002 and August 31, 2004 could be considered in this action.  Any earlier retaliation, the court found, was barred by the statute of limitations.  In essence, then, the retaliation must have come in the form of restrictions applied to the plaintiff's activities after charges against him were filed.  (See Doc. 23).

temporal proximity is not so close as to be 'unduly suggestive.'" Id. at 513 (quoting

Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000).  Plaintiff lacks

evidence of animus, however, that would allow a fact-finder to conclude that

retaliation occurred in this case.  No evidence establishes that plaintiff had

complained about the Troop S matter in the months or several years before the

State Police began to investigate and act on the allegations against him.  The

evidence also indicates that those defendants who were aware of plaintiff's protests

on the Troop S matter only became aware of those protests in the context of this

litigation.  Jeffrey Miller, for instance, testified at his deposition that he had heard a

rumor that troopers were slowing down the writing of tickets to protest the

consolidation of Troop S within county troops sometime in 1997.  (Jeffrey Miller

Dep., Defendants' Statement, Exh. 25).  He was unaware, however, that plaintiff had

been involved in that activity until he "became aware" of the complaint plaintiff filed in

the instant case.  (Id.).  Defendant Titler testified that he had been a member of the

Pennsylvania State Police at the time of the controversy over disbanding Troop S.

(Titler Dep. at 124).  Titler had no recollection of plaintiff's involvement in the

controversy; he testified that "I don't ever remember hearing Lance Zeglen's name

probably until this stuff all started happening."  (Id.).  By "stuff," Titler meant "the 15

year old girl . . . or the 17 year old girl."  (Id.).

        Plaintiff simply speculates that the State Police's actions against him were

related to his 1997 protests.  Courts have been clear that a plaintiff has not produced

15

evidence to survive a motion for summary judgment when that evidence consists of mere speculation and conjecture:  "an inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).  "[A] nonmoving party must adduce more than a mere scintilla of evidence in its favor, [citation omitted], and cannot simply reassert factually unsupported allegations contained in its pleadings." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Plaintiff attempts to avoid summary judgment by precisely such methods.  He has no evidence that any of the defendants acted in response to his complaints about Troop S years earlier, or that they were even aware of his protests before he filed a lawsuit alleging a first amendment violation.  When testifying about Defendant Miller, for instance, plaintiff contended that "[a]s the Colonel of the State Police, it's his duty and responsibility to know of such high level matters that are of such a large magnitude of politics in Harrisbug.  It's no secret in Harrisburg that my name was thrown around governor's mansions and it was thrown all around Headquarters.  Colonel Miller knew of me, Counselor." (Plaintiff's Dep. at 12).  Simlarly, in describing Defendant Transue's knowledge of his protests, plaintiff insisted that he had evidence that she was informed because of "just the fact it was common knowledge among the whole department." (Id. at 13).  Plaintiff likewise admitted that he had no evidence beyond speculation that Defendant Carusone knew of his involvement in the Troop S

16

complaints.[16]  (Id. at 14).[17]  Here, plaintiff posits "common knowledge" and then infers animus from that knowledge.  Such "evidence" is insufficient to survive summary judgment.

Moreover, as the magistrate judge pointed out, any restrictions placed on the plaintiff in February 2004 were based on events completely unrelated to any of plaintiff's protected speech, and which were the subject of an ongoing state police disciplinary proceeding.  The restrictions on plaintiff's conduct were related to that investigation, not to his earlier speech.  These restrictions prohibited plaintiff from contacting witnesses in the case against him and ordered him away from places where he might come in contact with his accusers.  Plaintiff has offered no evidence to demonstrate that investigators did not believe Brooke Quick's allegations, or that they instituted these restrictions for any reason except to protect their investigation.

---

[16]Plaintiff in all of these instances simply asserts that defendants must have known of his involvement: "Q.  Do you have any knowledge that [Christopher Carusone] knew of your role in the Troop S thing, whether he knew it at the time of the Troop S thing or anytime after that?  A.  I believe at the time–I'm not aware that he knew at the time of Troop S being disbanded.  I don't even know what his position was at that time.  Afterwards, I believe he would have known because it was no big secret that this retaliation against me and this whole case was due to my speaking out against Troop S.  It's common knowledge throughout the State Police.  It's no big secret."  (Plaintiff's Dep. at 14).

[17]The only "evidence" of retaliatory animus beyond his own speculation about the motives of officials that plaintiff points to are statements he attributes to Lieutenant Wanda Gilbert, who apparently told plaintiff "at a social function" that the State Police had continued their investigation after his acquittal only from a desire for "retaliation for Troop S."  (Plaintiff's Dep. at 15.  Plaintiff offers no evidence from Gilbert herself about this conversation.  Even his purported statements from Gilbert, however, are no more than mere speculation, as she did not mention any particular persons with the alleged animus or offer any basis for her claimed knowledge.

17

As such, a jury could not find that these restrictions, combined with plaintiff's past speech, provide evidence of retaliatory conduct.  The State Police sought to protect witnesses from a person accused of serious misconduct, and the restrictions they sought were reasonably related to that goal.

Finally, plaintiff contends that he "was a good officer" and that defendants lacked "a previous opportunity to retaliate against him" until the allegations of misconduct with young girls appeared.[18]  (Plaintiff's Objections to the Report and Recommendation (Doc. 80) at 16).  Apparently, defendants harbored their ill will for six years against the defendant, waiting patiently for him to make a mistake they could use to punish him.  As outlined above, however, plaintiff offers no evidence to indicate that a discriminatory animus remained in the years that intervened between his complaints and the time of the adverse actions against him.[19]  Accordingly, the

---

[18]Plaintiff goes on to argue that "defendants are intelligent enough to know that they could be legally liable for acting out against the plaintiff in an unwanted manner. Therefore, they had no choice but wait." (Plaintiff's Objections at 16-17).  We fail to see how refraining from acting against an employee who fails to engage in improper behavior demonstrates a retaliatory motive.  Indeed, retaliation seems more likely as a motive when the employer acts without cause.  We are also unconvinced that defendants' actions in response to the allegations against plaintiff are evidence that defendants harbored a long animus, but waited patiently for six years for an opportunity to pounce on the plaintiff when he finally misbehaved.  Any reasonable juror would conclude that defendants acted because they had an obligation to protect the public by investigating officers accused of preying on young girls.

[19]Plaintiff did suggest in his deposition that several of his supervisors had a continuing animus towards him, but these statements are mere conjecture about another's state of mind.  They are not admissible, and plaintiff offers no competent evidence about an intervening animus towards him that could allow the court to overlook the temporal distance between plaintiff's speech and his injuries.

plaintiff has presented no evidence by which a jury could conclude that the adverse actions against him were a result of a desire to retaliate for his earlier speech, and we will grant defendants' motion to dismiss this claim.

### ii. Malicious Prosecution

Plaintiff also disputes the magistrate judge's finding that summary judgment should be granted on his malicious prosecution claim.  He contends that the evidence indicates that defendants were motivated by personal bias, malice or revenge in bringing legal action against the plaintiff, and that such improper motives vitiate any evidence that indicates that probable cause existed to bring charges against him.  Plaintiff insists that he has evidence that defendants brought the charges against him because they "had it out for him because of his statements about Troop S disbanding."  (Plaintiff's Objections at 20).  He also contends that defendants lacked probable cause to bring such charges, and that a jury could therefore conclude that defendants engaged in a malicious prosecution.

In the context of Section 1983, malicious prosecution exists when a plaintiff shows that "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." Johnson v. Knorr, 477 F.3d 75, 82 (3d Cir. 2007).

19

The magistrate judge recommended that we grant defendant summary judgment on plaintiff's malicious prosecution claim for two reasons.  First, the court noted that criminal proceeding in plaintiff's case was initiated and charges approved by Robert O'Hara, a senior assistant deputy attorney general for the Pennsylvania Attorney General.  Plaintiff did not name O'Hara as a defendant in the case.  The Court found that plaintiff had produced no evidence that any of the named defendants had knowingly withheld facts or provided false evidence to O'Hara, and therefore no malicious prosecution claim could lie against them.  Second, the magistrate judge found that even if any of the defendants had initiated charges against the plaintiff, probable cause existed to bring such an action and plaintiff could not sustain his malicious prosecution claim against them.

Plaintiff does not address directly the first of these conclusions in objecting to the report and recommendation.  He does, however, argue that the actions of State Patrol Officers in recommending charges to O'Hara were malicious and deliberate, not merely an honest mistake.  Plaintiff also contends that he has actual evidence that defendants' actions in bringing charges against him were motivated by animus about his earlier complaint about disbanding Troop S.  He points to a statement allegedly made to him by Lieutenant Wanda Gilbert, who told plaintiff that "defendants had it out for him" because of his earlier statements.  (Plaintiff's Objections at 20).

We agree with the magistrate judge that no evidence exists to indicate that

any of the defendants named on this count initiated the charges against plaintiff.  In

most cases, "a prosecutor rather than a police officer initiates a criminal

prosecution."  Houston v. City of Philadelphia 2007 U.S. Dist. LEXIS 40026, at *20

(E.D. Pa. May 31, 2001); see also, Merrero v. Micewski, No. Civ. A. 96-8534, 1998

WL 414724, at *15 (E.D. Pa. July 22, 1998) (holding that "a plaintiff can not proceed

against a police officer for a claim of malicious prosecution because a prosecutor,

not a police officer, 'initiates' proceedings against an individual."); Reed v. City of

Chicago, 77 F.3d 1049, 1053 (7th Cir. 1996) (agreeing with Justice Ginsburg's

statement in a concurring opinion that "a malicious prosecution action against police

officers is 'anomalous,' since "the State's Attorney, not the police, prosecutes a

criminal action.").  Even if a prosecutor brings charges, "[a] person can be liable for

malicious prosecution if he 'fails to disclose exculpatory evidence to prosecutors,

makes false or misleading reports to the prosecutor, omits material information from

the reports, or otherwise interferes with the prosecutor's ability to exercise

independent judgment in deciding whether to prosecute.'" Telepo v. Palmer Twp., 40

F. Supp. 2d 596, 610 (E.D. Pa. 1999) ( (quoting Marcia v. Micewski *9 (E.D. Pa.

1998)).  A police officer can be liable for initiating a prosecution "if he or she

'knowingly provided false information to the prosecutor or otherwise interfered with

the prosecutor's informed discretion.'" Brockington v. City of Philadelphia, 354 F.

Supp. 2d 563, 569 (E.D. Pa. 2005) (quoting Gatter v. Zappile, 67 F. Supp. 2d 515,

521 (E.D. Pa. 1999)).

Deputy Attorney General Robert J. O'Hara signed the criminal complaint against the plaintiff.[20]   (See Exh. 14, Defendants' Statement).   During his deposition testimony, plaintiff's attorney asked O'Hara about the initiation of charges against his client. O'Hara testified that "I made the decision to file charges in the case." (O'Hara Testimony at 18).   After receiving a letter assigning him the case, O'Hara contacted John Duby to discuss the status of the investigation.   (Id.).   O'Hara met with the trooper, examined his case files, talked to superiors in the Attorney General's Office, and decided to file charges.   (Id. at 18-19).   O'Hara testified that his decision to charge plaintiff "[h]ad nothing to do with the fact that he was a trooper" or that the State Police had urged his prosecution.   (Id. at 25-26).   No one from the State Police ever "communicated" any "ulterior motive" for the prosecution to him.   (Id. at 79). Indeed, O'Hara spoke only with Corporal Duby and Trooper Sharif in connection with the case.   (Id.).   The State Police, O'Hara concluded, had conducted "a very thorough investigation" before turning the case over to him, O'Hara recalled.   (Id. at 77).   O'Hara testified that "I can't recall a case of a sexual nature in which there was so much discovery turned over." (Id. at 78).   Based on this evidence, O'Hara concluded that "there was sufficient probable cause to file a charge of corruption of minors against Mr. Zeglen." (Id.).   Corporal John Duby provided an affidavit that

---

[20]We note that O'Hara is not a defendant in this case.   Even if plaintiff had evidence to indicate that O'Hara brought charges without himself being satisfied that probable cause existed for those charges, our decision to grant summary judgment to the other defendants would not change.

outlined the allegations upon which the complaint were based.  (Id.). The affidavit

related the results of the investigation undertaken by Duby and Sharif including the

results of their interview with Brooke Quick.  (Id.).  The affidavit provides detailed

allegations of sexual contact, phone sex, and other inappropriate behavior between

plaintiff and Quick.  (Id.).

From this evidence, a jury could only conclude that O'Hara initiated the

charges against plaintiff.  He is not named as a defendant, and his conduct is

immaterial to our analysis.  We can only find liability for malicious prosecution, then,

if a disputed material fact exists over whether defendants knowingly provided false

information to O'Hara, and that this false information led to the charges against

plaintiff.  Plaintiff apparently contends that the defendants made up the allegations

that provided O'Hara with probable cause to bring criminal charges.  A desire to

retaliate against plaintiff for his earlier complaints provided the supposed motivation

for those falsehoods.  As with his complaints about first amendment retaliation,

however, plaintiff has offered no evidence beyond speculation and inference that

acted out of any motivation other than to investigate the serious charges against

him.  The evidence in the case indicates that Duby, Sharif and Saites investigated a

case initiated by complaints from a teenager's stepfather, found evidence that

indicated to them a crime had occurred, and passed that information along to a

prosecutor who determined that charges should be brought.  Plaintiff has therefore

offered no evidence by which a juror could conclude that defendants knowingly

provided O'Hara with false information, and we cannot conclude that a jury could find that any of the other defendants were responsible for the charges against plaintiff.

Moreover, even if we were to conclude that defendants could be liable for bringing charges we would find that they had probable cause to bring charges against the plaintiff.  We emphasize that "'to prevail on [a malicious prosecution] claim, [the plaintiff] must show that the officers lacked probable cause to arrest her.'" Johnson, 477 F.3d at 82 (quoting Wright v. City of Philadelphia, 409 F.3d 595, 604 (3d Cir. 2005)).  "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995).

Here, defendants received information that plaintiff had engaged in inappropriate and unwanted contact with minors.  These allegations came through the reports of a concerned stepfather; State Police officials did not initiate an investigation based on their dislike of plaintiff.  Troopers conducted an interview and were informed by a school official of other allegedly inappropriate behavior by plaintiff.  They then collected evidence from witnesses and from recorded conversations.  Concluding that evidence existed to show that plaintiff violated state law, investigators sought charges.  Plaintiff does not deny that police heard these allegations or undertook these investigations.  Instead, he insists that the allegations

24

should not have been believed because he was not involved in such behavior and

because the witnesses against him did not have stellar reputations for truthfulness.

He also contends that police brought charges not because they had probable cause,

but because they had an animus towards plaintiff because of his earlier protests

about the PSP's decision to disband Troop S.

We conclude that defendants had probable cause to initiate charges against

the plaintiff.  After hearing the allegations from Brooke Quick and from another high

school girl that defendant had engaged in inappropriate behavior and conducting an

investigation which seemed to confirm details of Quick's stories, troopers and the

State Attorney General's office concluded that plaintiff had committed the crimes for

which he was charged.  Plaintiff has produced no evidence that indicates that

defendants had no basis for this conclusion beyond the fact that he was not

convicted of any crime.[21]  Faced with the evidence discovered by the State Police, a

---

[21]Plaintiff contends that defendants acted without probable cause because they should not have believed Brooke Quick's allegations against him, and because they had a desire to harm him as a result of his protests about Troops S.  Plaintiff could show that the charges were invalid despite the apparent probable cause in the Duby's affidavit if:  "(1) the police officer knowingly and deliberately, or with reckless disregard for the truth made false statements or omissions that create a falsehood in applying for the warrant; and 2) such statements or omissions were material or necessary to finding of probable cause."  Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000).  Plaintiff offers no evidence for those claims, and does not dispute that the Troopers acted on allegations from Quick.  Instead, he contends that they should have assumed such claims were not true.  That argument is unpersuasive, especially since the evidence in the case indicates that the State Police acted to confirm Quick's allegations, bringing charges only after they satisfied themselves that Quick's description of plaintiff's bedroom was detailed and accurate and after they recorded conversations with the plaintiff that at least gave the implication that intimacy had occurred between the two.  A jury could not conclude from the evidence in the case that defendants made false statements or statements in reckless disregard for the truth which

reasonable person would have believed that an offense had been committed, and

probable cause to charge plaintiff existed.  Because defendants had this probable

cause, summary judgment on the plaintiff's malicious prosecution claim would be

appropriate even if defendants had improperly caused charges to be filed against

him.  We will adopt the report and recommendation on this point.

**The Remaining Claims**

We have therefore disposed of counts I and II of plaintiff's complaint, the

causes of action which give this court original jurisdiction to hear the case.  The only

remaining counts in the case, Count III of plaintiff's complaint and Defendant Quick's

counterclaim, are all state law causes of action which we have jurisdiction to hear

only because of the supplemental jurisdiction granted this court pursuant to 28

U.S.C. § 1367(a)  ("In any civil action of which the district courts have original

jurisdiction, the district courts shall have supplemental jurisdiction over all other

claims that are so related to claims in the action within such original jurisdiction that

they form part of the same case or controversy under Article III of the United States

Constitution.").   Federal law allows a district court to dismiss any remaining state-

law claims if "the district court has dismissed all claims over which it has original

jurisdiction."  28 U.S.C. § 1367(c)(3); see, e.g., Mark v. Borough of Hatboro, 856 F.

Supp. 966, 976 (E.D. Pa. 1994) (finding that "[b]ecause summary judgment is being

granted to each defendant as to the only federal claim, this Court may decline to

_____

created the grounds for a warrant.

exercise jurisdiction over the pendant state claims.").

Here, we have dismissed all of the federal claims in this case, and the only remaining matters are simple tort claims under well-settled Pennsylvania law. Federal courts have no interest in adjudicating such state-law claims, and we will decline to exercise our jurisdiction to hear them.  See Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) (holding that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.").

**Conclusion**

We will adopt the report and recommendation of the magistrate judge as it pertains to the federal causes of action in this case, and we will grant summary judgment to the defendants on those claims.  Because our jurisdiction over the other claims in the case is supplemental, we will exercise our discretion and decline to address those claims.  We will therefore dismiss the case.  An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LANCE A. ZEGLEN,** | : | **No. 3:04cv1940** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **JEFFREY MILLER,** | : | |
| **CYNTHIA TRANSHUE,** | : | |
| **JOHN DUBY,** | : | |
| **FARZAD SHARIF,** | : | |
| **BARRY TITLER,** | : | |
| **NICHOLAS SAITES,** | : | |
| **RICK BROWN,** | : | |
| **MICHAEL PATRICK,** | : | |
| **GARRETT RAIN,** | : | |
| **CHRISTOPHER CARUSONE, and** | : | |
| **BROOKE QUICK,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this 12th day of March 2008, the plaintiff's objections

(Doc. 80) to the reports and recommendations of Magistrate Judge Malachy E.

Mannion (Docs. 78-79) are hereby **OVERRULED**.  The various motions for summary

judgment in this case are hereby **GRANTED** in part and **DENIED** in part, as follows:

1) The defendants' motion for summary judgment (Doc. 53) is **GRANTED** as

to counts I and II of plaintiff's complaint;

2)  The plaintiff's motion for summary judgment (Doc. 45) is **GRANTED** as to

counts I, II and III of counter-plaintiff Brooke Quick's counterclaim;

28

3)  Counter-plaintiff Brooke Quick's motion for summary judgment (Doc. 73) is

hereby **DEEMED WITHDRAWN**; and

4) The motions for summary judgment on the remaining counts in the

complaint and counterclaim are hereby **DENIED** as moot pursuant to our

decision not to exercise supplemental jurisdiction in the case.

We note that these decisions dismiss all of the federal claims in the case.  Since this

court hereby declines to exercise its supplemental jurisdiction for any state law

claims remaining in the case, we will dismiss the action.  The Clerk of Court is

directed to **CLOSE** the case.

**BY THE COURT:**

**s/ James M. Munley**
**JAMES M. MUNLEY**
**UNITED STATES DISTRICT JUDGE**